SM

WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Takisha M. Johnson, | No. CV-22-00537-PHX-JAT (JFM) |
| Plaintiff, | |
| v. | **ORDER** |
| David Shinn, et al., | |
| Defendants. | |

Plaintiff Takisha M. Johnson, who is currently confined in Arizona State Prison Complex (ASPC)-Perryville, in Goodyear, Arizona, brought this civil rights case pursuant to 42 U.S.C. § 1983. (Doc. 10.) Defendants move for summary judgment (Doc. 47), and Plaintiff did not respond.[1]

The Court will grant the Motion for Summary Judgment and terminate the action.

**I.   Background**

On screening Plaintiffs' two-count First Amended Complaint (Doc. 10) pursuant to 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated an Eighth Amendment threat-to-safety/failure-to-protect claim against ASPC-Perryville maintenance staff A. Barnes in his individual capacity and against former Arizona Department of Corrections, Rehabilitation, and Reentry (ADC) Director David Shinn[2] and ASPC-Perryville Deputy

---

[1] The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc), regarding the requirements of a response. (Doc. 49.)

[2] In January 2023, Defendant Shinn stepped down as ADC Director, and Ryan Thornell was appointed as the new ADC Director. The Court will therefore direct the Clerk

Warden Bendell in their official capacities. (Doc. 11.) The Court directed these Defendants to answer. (*Id.*)

Defendants now move for summary judgment and argue that their alleged conduct did not amount to deliberate indifference and that Defendant Barnes is entitled to qualified immunity.

## II. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

---

of Court to substitute Director Thornell for Defendant Shinn in his official capacity pursuant to Federal Rule of Civil Procedure 25(d). The Court will hereinafter refer to Defendant Thornell when addressing Plaintiff's official capacity claim.

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

**III.     Facts**[3]

Plaintiff arrived at the ASPC-Perryville Lumley Unit in December 2020. (Doc. 48-1 at 4 (Pl. Dep. at 11:5–8).) Shortly after her arrival, Plaintiff applied for three jobs, including maintenance helper. (Doc. 48 (Defs.' Statement of Facts (DSOF)) ¶ 3.) In January 2021, Plaintiff was hired to work on a prison maintenance crew under Defendant Barnes's supervision and instruction. (*Id.* ¶¶ 3, 4; Doc. 10 at 4.)

Plaintiff informed the work coordinator that she had no maintenance experience, and the work coordinator told Plaintiff that she would be trained. (Doc. 48-1 at 4 (Pl. Dep. at 13:19–20).) Plaintiff told the work coordinator that she was willing to learn and that she would show up every day and do her best. (*Id.* (Pl. Dep. at 13:21–25).) During a brief 3–4-minute interview, Plaintiff informed Defendant Barnes that she did not have prior maintenance training or experience. (*Id.* at 5, 6 (Pl. Dep. at 17:23–18:4, 19:2–4); Doc. 10 at 4.)

---

[3] Because Plaintiff did not file a response or controverting statement of facts, the Court will consider Defendants' facts undisputed unless they are clearly controverted by Plaintiff's first-hand allegations in the verified Complaint or other evidence on the record. Where the nonmovant is a pro se litigant, the Court must consider as evidence in opposition to summary judgment all the nonmovant's contentions set forth in a verified complaint or motion. *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004).

In their Statement of Facts, Defendants assert that during her deposition, Plaintiff "acknowledged that the [First Amended] Complaint's allegations are wrong, but that her testimony is truthful." (Doc. 48 ¶ 1.) Defendants' description of Plaintiff's testimony is inaccurate. Plaintiff's actual testimony was that another prisoner helped her fill out the complaint form because Plaintiff did not fully understand the process of filing a lawsuit and that *if* her deposition testimony differed from what was stated on the complaint form, it was because the other prisoner wrote it down wrong. (*See* Doc. 48-1 at 13 (Pl. Dep. at 47:11–48:20).) Contrary to Defendants' characterization of her testimony, Plaintiff did not admit that any particular allegation in the First Amended Complaint was "wrong."

There were six people on Defendant Barnes's work crew, including Plaintiff. (Doc. 48 ¶ 10.) Plaintiff was shown how to use various power tools by another prisoner, Ashley Ierulli, who acted as the foreperson for the crew. (Doc. 48-1 at 5 (Pl. Dep. at 16:4–25).) Prisoner Ierulli showed Plaintiff how to use the power tools safely. (*Id.* (Pl. Dep. at 17:1–6).) Plaintiff did not operate heavy equipment, such as forklifts. (*Id.* (Pl. Dep. at 17:12–15).) Protective equipment was available on Defendant Barnes's work truck. (Doc. 48 ¶ 13.) Plaintiff had been working on the maintenance crew for approximately six or seven months when she was injured while assisting the crew in servicing the swamp coolers on the D-Yard roofs. (Doc. 48 ¶¶ 4, 7; Doc. 10 at 5.)

On July 7, 2021, Plaintiff and the rest of the work crew were servicing swamp coolers on the roof of the Lumley Unit D-yard housing unit. (Doc. 48-1 at 6 (Pl. Dep. at 20:13–17).) The roof where the crew was working was wet, slippery, covered in animal feces, and had rotted through in places. (Doc. 10 at 5.) The pit where the crew was working on the day Plaintiff was injured lacked any safety railing or ladder, unlike other pits. (*Id.*) Defendant Barnes was aware of the conditions and problems with that section of roof. (*Id.*) The crew had been doing this type of work for several months, since about April or May, which was when Plaintiff first went up on a roof. (Doc. 48 ¶ 16.) Prior to July 7, 2021, Plaintiff had participated in servicing the swamp coolers "[m]ore than five" times. (Doc. 48-1 at 6 (Pl. Dep. at 20:21–23).) It typically took 10–15 minutes to service a swamp cooler, if nothing went wrong. (*Id.* at 7 (Pl. Dep. at 23:2–4).)

While the crew was working on July 7, 2021, Defendant Barnes was walking between the various units, "[c]ontinuosly trying to check on all of [the crew members]." (*Id.* (Pl. Dep. at 24:8–11).) Plaintiff was not assigned to climb into the pits to work on the swamp coolers; instead, she was assigned the task of running tools back and forth for the other workers. (*Id.* at 8 (Pl. Dep. 28:24–29:7); Doc. 48 ¶ 17.) Plaintiff testified that Defendant Barnes "actually made [Plaintiff] the runner . . . because [Plaintiff was] a little shorter for a lot of the jobs that they required [crew members] to do," and that Defendant Barnes "always tried to make it a little lighter on [Plaintiff]." (Doc. 48 ¶ 18.)

Plaintiff was not planning on going down into the pit, but two crew members asked her to come down to help them out. (*Id.* ¶ 19.) Plaintiff attempted to climb down into the pit using the mechanical equipment, and she turned her ankle stepping down onto the deck, dislocating and fracturing it. (*Id.* ¶ 20; Doc. 10 at 6.) Plaintiff screamed for help, and another prisoner went to find Defendant Barnes and inform him of Plaintiff's fall. (Doc. 10 at 6.) Defendant Barnes called Lumley Unit control and summoned officers and medical staff. (*Id.*) When medical staff arrived, they immediately told officers to call 911 due to the obvious severity of Plaintiff's injuries. (*Id.*) Emergency responders took Plaintiff to the hospital where she underwent extensive surgery and had hardware, including a metal plate, inserted in her foot. (*Id.*)

Plaintiff testified that Defendant Barnes did not order her to climb into the pit and that he did not even know that she was going to climb into it. (Doc. 48 ¶¶ 22, 23.) Defendant Barnes was standing next to Plaintiff at the pit's ledge before Plaintiff tried to climb down, but he had walked away to watch other workers on the roof just before Plaintiff attempted to climb down. (*Id.* ¶ 24.) Plaintiff testified that she could see Defendant Barnes and could have gotten his attention before climbing into the pit. (*Id.* ¶ 31.) With respect to her training, Plaintiff testified that Defendant Barnes "showed us about—like when he comes—it was more as you go per project. If we were to use something, they would show you that day. That's kind of how it works." (*Id.* ¶ 32.) Plaintiff testified that Defendant Barnes would never make a prisoner worker do anything the prisoner thought was dangerous and did not want to do. (*Id.* ¶ 9.)

ADC Department Order (DO) 404, *Fire, Safety and Loss Prevention*, outlines ADC's policy on prisoner workers. The version of DO 404 that was in effect when Plaintiff's claim arose provided that maintenance crew supervisors must:

> 11.1 Prior to hiring inmates to perform specific tasks, attempt to determine inmates' skill/knowledge level by:
>
> 11.1.1 Reviewing their Department work history.
>
> 11.1.2 Interviewing inmates to determine their knowledge of and/or skill in the work to be performed.

       11.1.3 Observing and/or verifying their ability to perform claimed skills.

11.2    Prior to allowing inmates to perform specific tasks, ensure:

       11.2.1 Inmates receive training on the potential job hazards and have appropriate PPE [personal protective equipment] in accordance with the appropriate Job Hazard Analysis form and any other appropriate safety information.

       11.2.2 Inmates receive tools/equipment training and demonstrate their ability in its usage.

11.3    Document training provided to the inmate workers relative to their assigned duties, and forward[] the training documents to the appropriate Program Area Supervisor, who shall maintain the file.

11.4    Ensure the following:

       11.4.1 The proper tools/equipment assigned for tasks are in good working order/condition.

       11.4.2 Inmates use safe working practices, including the usage of appropriate PPE.

11.5    Supervise work from implementation through completion, ensuring all inmate workers comply [federal regulations] or remove unsafe inmates from tasks.

11.6    Report all inmate serious physical injuries by completing a Significant Incident Report form in accordance with Department Order #105, Information Reporting. The OSC shall receive a copy.

11.7    Report any incident involving unsafe work practices to the Physical Plant Manager/Administrator and the OSC for appropriate action.  Department employees who knowingly observe and do not report a safety procedure violation or condone unsafe practices may be subject to disciplinary action in accordance with Department Order #601, Administrative Investigations and Employee Discipline.

       11.7.1 Vicarious liability and deliberate indifference laws also apply.  A person observing but not reporting violations may be held personally liable when an

> unqualified inmate worker performs tasks resulting in the injury of the inmate or another person.
>
> 11.8 Initiate Work Program assignment changes due to poor performance, disruptive behavior, and/or security threats, in accordance with Department Order #903, Inmate Work Activities.

(Doc. 48-3 at 2–3 (DO 404 § 11.0, effective November 9, 2018).

Plaintiff asserts that Defendant Barnes often left his prisoner workers unsupervised, even when they were using dangerous tools and working in unsafe conditions. (Doc. 10 at 4.) Plaintiff states that she did not receive safety training, as required under DO 404, prior to the day she fell. (*Id.* at 5.)

Plaintiff asserts that Defendants Thornell and Bendell have a policy or custom of forcing prisoners to work in unsafe and hazardous conditions and that the failure to provide a reasonably safe work environment constitutes deliberate indifference to prisoner safety. (*Id.* at 7.) Plaintiff states that, despite DO 404.11.2's requirement that prisoner workers be properly trained, supervised, and provided safety equipment, the policy has been intentionally ignored for years, and Defendants knew the policy was not being enforced because DO 404.11.3 required that all safety training be documented in a file, but no documentation exists to establish that prisoner workers in the Lumley Unit received any such training. (*Id.*) Plaintiff asserts that Defendants Shinn and Bendell willfully ignored risks to prisoner workers from unsafe conditions and took no action to ensure prisoner workers were trained, supervised, and provided appropriate safety equipment. (*Id.*)

**IV.    Defendant Barnes – Qualified Immunity**

**A.    Legal Standard**

Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In deciding if qualified immunity applies, the Court must determine: (1) whether the facts alleged show the defendant's conduct violated a constitutional right; and (2) whether that right was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 230–

32, 235–36 (2009) (courts may address either prong first depending on the circumstances in the particular case). In the qualified immunity analysis, the court must consider all disputed facts in the light most favorable to the nonmovant. *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 946 (9th Cir. 2017).

For a right to be clearly established there does not have to be a case directly on point; however, "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2017)). Clearly established law "must be particularized to the facts of the case," and "should not be defined at a high level of generality." *White*, 137 S. Ct. at 552 (quotation and citation omitted). A right is clearly established when case law has been "earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017) (citing *White*, 137 S. Ct. at 551).

Once the right at issue is defined, the court must then "identify a case where an officer acting under similar circumstances as [the defendant] was held to have violated" that right. *Id.* If there is no such case, then the right was not clearly established. *See id.* at 1117–18. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal citations omitted). "The Supreme Court has made clear that 'officials can still be on notice that their conduct violates established law even in novel factual circumstances.'" *Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir. 2011) (quoting *Hope*, 536 U.S. at 741). This principle is particularly relevant "in the context of Fourth Amendment cases, where the constitutional standard—reasonableness—is always a very fact-specific inquiry." *Id.*; *see Drummond v. City of Anaheim*, 343 F.3d 1052, 62 (9th Cir. 2003) (holding that "no federal case directly on point [was needed] to establish" that the conduct at issue violated clearly established law and constituted excessive force).

**B.     Discussion**

       **1.     Constitutional Violation**

To succeed on an Eighth Amendment threat-to-safety claim, Plaintiff must show that she was incarcerated under conditions posing a substantial risk of harm and that prison officials were "deliberately indifferent" to those risks. *Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994). A plaintiff must demonstrate facts that satisfy a two-part test: (1) that the alleged deprivation is, objectively, sufficiently serious, and (2) that the official is, subjectively, deliberately indifferent to the prisoner's safety. *Id.* at 834. To show deliberate indifference, a plaintiff must allege facts to support that a defendant knew of, but disregarded, an excessive risk to prisoner safety. *Id.* at 837. As to the knowledge component, "the official must both [have been] aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and he must also [have] draw[n] the inference." *Id.* But to prove knowledge of the risk, the prisoner may rely on circumstantial evidence; in fact, the very obviousness of the risk may be sufficient to establish knowledge. *Id.* at 842.

Construing the facts in Plaintiff's favor, there is at least a question of fact as to the objective prong of the deliberate indifference analysis because the undisputed evidence shows that Plaintiff was working in conditions that posed a substantial risk of harm. At the time of Plaintiff's injury, the roof of the D-yard unit was wet, slippery, and there was no safety railing or ladder in the pit area. These circumstances could lead a reasonable jury to conclude that Plaintiff's working conditions presented an objectively serious risk of injury, especially in light of the injury Plaintiff suffered.

However, as to the subjective prong, the evidence does not support a finding of deliberate indifference by Defendant Barnes. Even if Plaintiff faced an objectively serious risk of injury, Defendant Barnes did not order Plaintiff to climb down into the pit with the other members. In fact, Plaintiff testified that Defendant Barnes had specifically assigned her to be the runner that day so that she would not have to go into the pit. The undisputed facts show that Defendant Barnes was not even aware that Plaintiff had climbed into the

pit until he was informed that she had fallen and suffered an injury. Plaintiff also testified that prisoner/foreperson Ashley Ierulli trained her on how to use power tools safely and that Defendant Barnes showed crew members what to do before they started each project. Protective equipment was provided to the crew members. On these facts, the record does not reflect that Defendant Barnes knew of a risk to Plaintiff and disregarded that risk. At most, Defendant Barnes's role in the incident could be construed as negligence, which is not actionable pursuant to § 1983. Because there is no constitutional violation, Defendant Barnes is entitled to qualified immunity, and the Motion for Summary Judgment is granted as to the claim against Defendant Barnes.

## V.     Defendants Thornell and Bendell – Official Capacity

To prevail on a claim against Defendants Thornell and Bendell in their official capacities, Plaintiff must show that an official policy or custom caused the constitutional violation. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). To make this showing, Plaintiff must demonstrate that (1) she was deprived of a constitutional right; (2) ADC had a policy or custom; (3) the policy or custom amounted to deliberate indifference to Plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001). Further, if the policy or custom in question is an unwritten one, Plaintiff must show that it is so "persistent and widespread" that it constitutes a "permanent and well settled" practice. *Monell*, 436 U.S. at 691 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)).

As discussed above, the record does not support a finding that Plaintiff was deprived of a constitutional right. Moreover, Plaintiff has only presented one instance, on July 7, 2021, when she was injured while servicing swamp coolers on the roof of the D-yard. Other than that, Plaintiff only asserts that Defendants had a policy or custom of forcing prisoners to work in unsafe and hazardous conditions in violation of DO 404. (Doc. 10 at 7.) Such vague and conclusory evidence is insufficient to show a pattern or practice of constitutional violations. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th

Cir. 2007) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment."). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). Absent more specific information about other instances when Plaintiff or other prisoner workers were harmed as a result of hazardous working conditions, there is insufficient evidence of a persistent and widespread custom or policy to support an official capacity claim. Accordingly, summary judgment will be granted as to Plaintiff's official capacity claim against Defendants Thornell and Bendell.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is withdrawn as to Defendants' Motion for Summary Judgment (Doc. 47).

(2) The Clerk of Court must **substitute** ADC Director Ryan Thornell for Defendant Shinn in his official capacity pursuant to Federal Rule of Civil Procedure 25(d), and **dismiss** Defendant Shinn from the action.

(2) Defendants' Motion for Summary Judgment (Doc. 47) is **granted**, and the action is terminated with prejudice. The Clerk of Court must enter judgment accordingly.

Dated this 16th day of October, 2023.

*James A. Teilborg*
Senior United States District Judge